**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROGER J. STONE, JR et al., | |
| *Plaintiffs*, | |
| v. | No. 1:22-cv-00492-CJN |
| ADAM B. SCHIFF et al., | |
| *Defendants*. | |

**CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants the Honorable Nancy Pelosi, the Honorable Bennie G. Thompson, the Honorable Elizabeth L. Cheney, the Honorable Adam B. Schiff, the Honorable Jamin B. Raskin, the Honorable Susan E. Lofgren, the Honorable Elaine G. Luria, the Honorable Peter R. Aguilar, the Honorable Stephanie Murphy, the Honorable Adam D. Kinzinger, and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Congressional Defendants") respectfully move for an order dismissing Plaintiffs' Complaint (February 24, 2022) (ECF No. 1). For the reasons set forth in the accompanying Memorandum of Points and Authorities, the Complaint should be dismissed with prejudice.

A proposed order is attached.

Respectfully submitted,


/s/ Douglas N. Letter
DOUGLAS N. LETTER
   *General Counsel*
TODD B. TATELMAN
   *Principal Deputy General Counsel*
ERIC R. COLUMBUS
   *Special Litigation Counsel*
MICHELLE S. KALLEN
   *Special Litigation Counsel*
STACIE M. FAHSEL
   *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com

MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

July 22, 2022

---

\* Appearing pursuant to 2 U.S.C. § 5571(a).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROGER J. STONE et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) |
| | ) |
| ADAM B. SCHIFF et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Case No. 1:22-cv-00492-CJN

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

      A.      The January 6th Attack and Roger Stone ................................................. 2

      B.      The Formation of the Select Committee ................................................... 6

      C.      The Select Committee's Subpoena to AT&T ........................................... 7

STANDARD OF REVIEW ..................................................................................................... 8

ARGUMENT ........................................................................................................................... 8

I.       The Select Committee Is a Duly Authorized Committee ................................... 9

II.      The Subpoena Is Not Overly Broad or Beyond the Scope of the Select Committee's Jurisdiction ................................................................................. 15

III.    The Subpoena Does Not Violate the Fourth Amendment ................................ 17

IV.    The Subpoena Does Not Violate the First Amendment .................................... 20

V.     The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from AT&T Pursuant to a Lawful Subpoena ......................................................................................................... 22

CONCLUSION ...................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................8

*Barenblatt v. United States*,
  360 U.S. 109 (1959)...........................................................................................20, 22

*\*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019) ................................................................................9

*Barry v. U.S. ex rel. Cunningham*,
  279 U.S. 597(1929)....................................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................8

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*,
  860 F.2d 346 (9th Cir. 1988). ..................................................................................21

*Brown v. Sprint Corp. Sec. Specialist*,
  2019 WL 418100 (E.D.N.Y. Jan. 31, 2019) ...........................................................19

*Buckley v. Valeo*,
  424 U.S. 1 (1976)...............................................................................................21, 22

*\*Budowich v. Pelosi*,
  No. 21-3366 (D.D.C.) ..............................................................................................14

*Burnap v. United States*,
  252 U.S. 512 (1920)..................................................................................................24

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018)........................................................................................18, 19

*Digital Realty Tr., Inc. v. Somers*,
  138 S. Ct. 767 (2018)................................................................................................22

*Eastland v. United States Servicemen's Fund*,
  421 U.S. 491 (1975)............................................................................................18, 20

*\*Eastman v. Thompson*,
  No. 22-99 (C.D. Cal.)...............................................................................................14

*Hubbard v. United States*,
514 U.S. 695 (1995)..........................................................................................23, 24

*In re Stone*,
940 F.3d 1332 (D.C. Cir. 2019) ..................................................................................2

*McGrain v. Daugherty*,
273 U.S. 135 (1927)....................................................................................................15

*McPhaul v. United States*,
364 U.S. 372 (1960)....................................................................................................18

*Meadows v. Pelosi*,
No. 21-3217 (D.D.C.) ................................................................................................13

*Quinn v. United States*,
349 U.S. 155 (1955)..............................................................................................15, 16

*Rangel v. Boehner*,
20 F. Supp. 3d 148 (D.D.C. 2013) ............................................................................9

*Repub. Nat'l Comm. v. Pelosi ("RNC")*,
2022 WL 1294509 (D.D.C.) ................................................................................13, 20

*Senate Permanent Subcomm. v. Ferrer*,
199 F. Supp. 3d 125 (D.D.C. 2016)......................................................................20, 22

*Smith v. Maryland*,
442 U.S. 735 (1979)....................................................................................................18

*Trump v. Deutsche Bank AG*,
943 F.3d 627 (2d Cir. 2019)......................................................................................24

*Trump v. Mazars USA, LLP*,
140 S. Ct. 2019 (2020)..........................................................................................16, 24

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021).............................................................................1, 2, 17, 21

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
933 F.3d 728 (D.C. Cir. 2019) ..................................................................................14

*United States v. Bannon*,
No. 21-670 (D.D.C.) ..................................................................................................13

*United States v. Beverly*,
943 F.3d 225 (5th Cir. 2019) ....................................................................................19

*United States v. Bramblett*,
    348 U.S. 503 (1955) .......................................................................................24

*United States v. Chem. Found., Inc.*,
    272 U.S. 1 (1926) ..........................................................................................10

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ...................................................................9, 13

*United States v. Searcy*,
    2021 WL 3616062 (W.D. Pa. Aug. 16, 2021) ...............................................19

*United States v. Shroyer*,
    No. 21-MJ-572 (D.D.C. Aug. 25, 2021) .........................................................4

*United States v. Stone*,
    394 F. Supp. 3d 1 (D.D.C. 2019) ...................................................................2

*Vander Jagt v. O'Neill*,
    699 F.2d 1166 (D.C. Cir. 1982) .....................................................................9

**Statutes**

26 U.S.C. §§ 8001-05 .........................................................................................10

18 U.S.C. § 6 ......................................................................................................23

18 U.S.C. §§ 2701 *et seq.* ...................................................................................22

    18 U.S.C. § 2702 .......................................................................................22, 25

    18 U.S.C. § 2711 ...........................................................................................24

    18 U.S.C. § 2712 ...........................................................................................24

**Legislative & Constitutional Authorities**

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) .................................................10

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) .................................................10, 14

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) .................................................12

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ............................................12

167 Cong. Rec. H7786 (daily ed. Dec. 14, 2021) ................................................12

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ................................................12

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021)......................................................12

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) .............................................................12

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022).........................................................12

False Statements Accountability Act of 1996,
 Pub. L. No. 104-292, 110 Stat 3459 .....................................................................24

H. Rep. No. 109-377 (2006) ...........................................................................................11

H. Res. 6, 116th Cong. (2019) ........................................................................................15

H. Res. 24, 110th Cong. (2007) ......................................................................................15

H. Res. 437, 109th Cong. (2005) ....................................................................................11

H. Res. 503, 117th Cong. (2021) .................................................2, 6, 10, 11, 12, 14, 15, 16, 17, 18

H. Res. 730, 117th Cong. (2021) ....................................................................................12

H. Res. 851, 117th Cong. (2021) ....................................................................................12

H. Res. 1037, 117th Cong. (2022) ..................................................................................12

Rules of the U.S. House of Representatives, 117th Cong. (2021)

 Rule I.....................................................................................................................10, 14

 Rule X ........................................................................................................................10

U.S. Const., Art. I, § 5, cl. 2............................................................................................9

## **Other**

8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172.........................14

Aaron R. Cooper, *Congressional Surveillance*,
 70 Am. U. L. Rev. 1799 (2021) ...............................................................................24

Alan Feuer, *Group Chat Linked to Roger Stone Shows Ties Among Jan. 6 Figures*, N.Y. Times
 (May 20, 2022), https://perma.cc/7PXT-D2XB .......................................................3

Alexandra Hutzler, *Alex Jones Leads 'Stop the Steal' Rally at Georgia's Capitol to Protest
 Election Results*, Newsweek (Nov. 18, 2020), https://perma.cc/JM7U-EXN2 .......................3

Anthony Man, *At Trump golf club in West Palm Beach, Roger Stone thanks president for
 pardon*, S. Fla. Sun Sentinel (Dec. 28, 2020),
 https://perma.cc/KK4Y-LYN7...................................................................................4

Audrey Ash & Marshall Cohen, *Alleged Oath Keeper charged in Capitol riot chauffeured Roger Stone, FBI agent says*, CNN (Mar. 11, 2021), https://perma.cc/2RWG-4WMF ..................................................................6

Barton Gellman, *The Election That Could Break America*, The Atlantic (Sept. 23, 2020)..................................................17

*Black's Law Dictionary* (11th ed. 2019)......................................................14

Charles Homans, *How 'Stop the Steal' Captured the American Right*, N.Y. Times (July 19, 2022), https://perma.cc/RT8W-NEAM ....................................2

Dalton Bennett & Jon Swaine, *The Roger Stone Tapes*, Wash. Post (Mar. 4, 2022), https://perma.cc/PU7F-KZ6A ....................................................2, 3

Derrick Mullins, *Roger Stone Call [sic] Ali to Give a Message to the Crowd Atlanta GA Stop The Steal Rally*, YouTube (Nov. 24, 2020) https://perma.cc/MWS3-HNGD ..................................................................3

*Here's Every Word from the Seventh Jan. 6 Committee Hearing on its Investigation* ("*Select Committee Seventh Hearing Transcript*"), NPR (July 12, 2022), https://perma.cc/4ED2-3RDV ................................................................3, 5

*Here's Every Word from the Sixth Jan. 6 Committee Hearing on its Investigation* ("*Select Committee Sixth Hearing Transcript*"), NPR (June 28, 2022), https://perma.cc/N98J-T8FL ..................................................................5

Matt Zapatosky, *et. al.*, *Trump pardons Charles Kushner, Paul Manafort, Roger Stone in latest wave of clemency grants*, Wash. Post (Dec. 23, 2020), https://perma.cc/8TFE-DR4V ...........4

Olivia Rubin, *et al.*, *Authorities arrest Oath Keeper seen with Trump adviser Roger Stone on morning of insurrection*, ABC News (Mar. 8, 2021), https://perma.cc/SL7U-S8DQ ..................................................................6

Phillip Tran, Roger Stone speech at Trump protest on Jan. 5th, 2021, YouTube (Jan. 5, 2021), https://perma.cc/KK4Y-LYN7..................................................................5

Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021), https://perma.cc/4JNC-73R2..................................................................7

Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA ..................................................................7

Ryan Goodman & Justin Hendrix, *EXCLUSIVE: New Video of Roger Stone with Proud Boys Leaders Who May Have Planned for Capitol Attack*, Just Security (Feb. 6, 2021), https://perma.cc/2Q3G-R7HP ............................................................................................3, 4, 5

Spencer S. Hsu, *et al.*, *Roger Stone guilty on all counts of lying to Congress, witness tampering*, Wash. Post (Nov. 15, 2019), https://perma.cc/TJE4-NBEE ..............................................................................................4

Spencer S. Hsu, *Second Oath Keepers member pleads guilty to seditious conspiracy*, Wash. Post (Apr. 29, 2022), https://perma.cc/5RYD-WDMU ...........................................................................................6

Tom Jackman, *et al.*, *Proud Boys sparked clashes during pro-Trump rally, D.C. officials say*, Wash. Post (Dec. 13, 2020, 10:32 PM)..........................................................................................4

U.S. Dep't of Just., *JAMES, Joshua* (Mar. 2, 2022), https://perma.cc/96PZ-2S37 ...............................................................................................6

U.S. Dep't of Just., *ULRICH, Brian* (Apr. 29, 2022), https://perma.cc/8TTJ-HJPA ..............................................................................................6

## INTRODUCTION

Plaintiff Roger Stone was involved with the effort to overturn the results of the 2020 election.  He now seeks to prevent a a properly constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business."  *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *inj. denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022) (No. 21-932).

Mr. Stone, who played a key role in setting the stage for the January 6th attacks, is trying to block a subpoena issued by the House Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) to AT&T seeking subscriber information, connection records, and records of session times and durations of calls (the subpoena did ***not*** seek communications content or any geo-location information) from November 1, 2020, through January 31, 2021, for phone numbers associated with the AT&T account of Plaintiff Drake Ventures LLC, a limited liability company through which Mr. Stone provides consulting services.  *See* Compl. ¶ 3.  Plaintiffs ask this Court to enjoin enforcement of that subpoena and to declare the Select Committee invalid.  Supreme Court and D.C. Circuit precedent, along with long-established constitutional principles, compel rejection of these claims.

*First*, Plaintiffs are wrong that the Select Committee is not duly authorized.  Every court that has considered this challenge to the Select Committee has rejected it.  *Second*, the subpoena is not overly broad nor beyond the scope of the Select Committee's jurisdiction.  *Third*, the subpoena does not violate the Fourth Amendment.  *Fourth*, the subpoena does not violate the First Amendment.  *Fifth*, the Stored Communications Act does not restrict the Select Committee's lawful subpoena seeking non-content information.

In short, the Complaint here presses a variety of flawed legal claims designed to thwart the Select Committee's efforts to understand fully, and to prevent a recurrence of, the events of January 6th.  This Court should dismiss the Complaint in its entirety.

## BACKGROUND

### A.    The January 6th Attack and Roger Stone

On January 6, 2021, violent rioters seeking to stop the peaceful transfer of power following the 2020 Presidential election launched an assault on the United States Capitol.  H. Res. 503, 117th Cong. (2021), Preamble.  Rioters attacked police, breached the Capitol, and obstructed and impeded the electoral count.  The attack on the Capitol ultimately "left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  *Trump v. Thompson*, 20 F.4th at 15 (citation omitted).  Law enforcement eventually cleared the rioters, and the electoral count successfully resumed later that night after a nearly six-hour delay.

January 6th was the culmination of months of organized attacks on the legitimacy of the 2020 Presidential election and false claims about its winner.  Mr. Stone, a longtime political adviser to former President Donald Trump,[1] played a key role in these efforts.  Mr. Stone helped lead the "Stop the Steal" movement.[2]  In fact, he reportedly coined the phrase "Stop the Steal" regarding unsubstantiated claims of election fraud in the 2016 Republican Presidential primary.[3]  Mr. Stone also communicated with leaders of violent extremist groups who have been charged

---

[1] *See In re Stone*, 940 F.3d 1332, 1334 (D.C. Cir. 2019); *United States v. Stone*, 394 F. Supp. 3d 1, 7-8 (D.D.C. 2019).

[2] *See, e.g.*, Dalton Bennett & Jon Swaine, *The Roger Stone Tapes*, Wash. Post (Mar. 4, 2022), https://perma.cc/PU7F-KZ6A.

[3] *See, e.g.*, Charles Homans, *How 'Stop the Steal' Captured the American Right*, N.Y. Times (July 19, 2022), https://perma.cc/RT8W-NEAM.

with crimes related to January 6th,[4] and he communicated with President Trump and others regarding strategies to overturn the 2020 election results.[5]

During, at a minimum, the period between the November 3, 2020 election and January 6, 2021, Plaintiff communicated with leaders of two violent extremist groups, the Proud Boys and Oath Keepers, regarding security at events intended to challenge or undermine the results of the Presidential election.[6]  One series of events included rallies outside government buildings in Atlanta, Georgia, around November 18 through November 21, 2020, which were led in part by "Stop the Steal" co-founder Ali Alexander and radio show host Alex Jones, and involved Proud Boys leader Enrique Tarrio.[7]  On November 20, Mr. Stone spoke (over a telephone that Mr. Alexander held up to a microphone) to a crowd outside the Georgia Capitol; he advanced election fraud claims and exclaimed "Victory or death!"[8]

On December 11, Mr. Stone spoke at a demonstration in Washington, D.C., alongside three people—including Mr. Tarrio—all of whom have since been charged with crimes related to

[4] *See, e.g.*, Alan Feuer, *Group Chat Linked to Roger Stone Shows Ties Among Jan. 6 Figures*, N.Y. Times (May 20, 2022), https://perma.cc/7PXT-D2XB.
[5] *See, e.g.*, Ryan Goodman & Justin Hendrix, *EXCLUSIVE: New Video of Roger Stone with Proud Boys Leaders Who May Have Planned for Capitol Attack*, Just Security (Feb. 6, 2021), https://perma.cc/2Q3G-R7HP.
[6] *See* Feuer, *supra* n.4; *Here's Every Word from the Seventh Jan. 6 Committee Hearing on its Investigation* ("*Select Committee Seventh Hearing Transcript*"), NPR (July 12, 2022), https://perma.cc/4ED2-3RDV ("JAMIE RASKIN: . . . The committee obtained [messages] from a group chat called Friends of Stone, FOS, which included Stone, [Oath Keepers leader Stewart] Rhodes, [Proud Boys leader Enrique] Tarrio and Ali Alexander. The chat focused on various pro-Trump events in November and December of 2020, as well as January 6th . . . . These friends of Roger Stone had a significant presence at multiple pro-Trump events after the election, including in Washington on December the 12th.").
[7] *See, e.g.*, Alexandra Hutzler, *Alex Jones Leads 'Stop the Steal' Rally at Georgia's Capitol to Protest Election Results*, Newsweek (Nov. 18, 2020), https://perma.cc/JM7U-EXN2.
[8] Derrick Mullins, *Roger Stone Call [*sic*] Ali to Give a Message to the Crowd Atlanta GA Stop The Steal Rally*, YouTube (Nov. 24, 2020), https://perma.cc/MWS3-HNGD; Bennett & Swaine, *supra* n.2.

January 6th.[9]  Mr. Stone told that crowd, "We will fight to the bitter end for an honest count of

the 2020 election.  Never give up, never quit, never surrender, and fight for America!"[10]

     The next day, violence ensued following a related "Stop the Steal" rally in Washington

D.C., leading to many arrests.[11]  Eight police officers were injured, four people were stabbed,

and four churches were vandalized.[12]  According to District of Columbia officials, members of

the Proud Boys who refused to accept the results of the Presidential election sparked the

violence.[13]

     On December 23, Mr. Stone, who in 2019 had been convicted of lying to Congress and

witness tampering, received a pardon from Mr. Trump.[14]  On December 27, Mr. Stone reportedly

posted on Parler, an online social networking service, that he met Mr. Trump "in person" to

thank him for the pardon and advised Mr. Trump on "how he can appoint a special counsel with

full subpoena power to ensure that those who are attempting to steal the 2020 election through

voter fraud are charged and convicted and to ensure that Donald Trump continues as our

president."[15]

---

[9] *See, e.g.*, Goodman & Hendrix, *supra* n.5; *see also* Second Superseding Indictment, *United States v. Nordean*,  No. 21-cr-175 (D.D.C. Mar. 7, 2022), https://perma.cc/CC64-4SQU; Information, *United States v. Shroyer*,  No. 21-MJ-572 (D.D.C. Aug. 25, 2021), https://perma.cc/BRA6-SHTL.

[10] *See* Goodman & Hendrix, *supra* n.5.

[11] *See, e.g.*, Tom Jackman *et al.*, *Proud Boys sparked clashes during pro-Trump rally, D.C. officials say*, Wash. Post (Dec. 13, 2020), https://perma.cc/79FR-BQZA.

[12] *See id.*

[13] *See id.*

[14] *See, e.g.*, Matt Zapotosky *et al.*, *Trump pardons Charles Kushner, Paul Manafort, Roger Stone in latest wave of clemency grants*, Wash. Post (Dec. 23, 2020), https://perma.cc/8TFE-DR4V; Spencer S. Hsu *et al.*, *Roger Stone guilty on all counts of lying to Congress, witness tampering*, Wash. Post (Nov. 15, 2019), https://perma.cc/TJE4-NBEE.

[15] *See, e.g.*, Anthony Man, *At Trump golf club in West Palm Beach, Roger Stone thanks president for pardon*, S. Fla. Sun Sentinel (Dec. 28, 2020), https://perma.cc/KK4Y-LYN7.

On January 5, 2021, Mr. Stone delivered a speech at a rally at Freedom Plaza in Washington, D.C., describing the effort to overturn the election as a battle "between good and evil" and warning of a "thousand years of darkness" if Mr. Trump did not remain in office.[16] Other speakers at the rally included Mr. Flynn, Mr. Alexander, and Mr. Jones, each of whom made remarks of a similar tenor.[17] Sworn testimony presented to the Select Committee indicates that Mr. Trump asked his Chief of Staff, Mark Meadows, to call Mr. Stone and Mr. Flynn that same day.[18] The testimony suggests Mr. Meadows did in fact call Mr. Stone that evening.[19]

Communications records the Select Committee displayed during its July 12, 2022 hearing indicate that members of the Oath Keepers planned to provide personal security for Mr. Stone on January 5th and 6th.[20] During public appearances on those dates, Mr. Stone was in fact

---

[16] Goodman & Hendrix, *supra* n.5; Phillip Tran, *Roger Stone speech at Trump protest on Jan. 5th, 2021*, YouTube (Jan. 5, 2021), https://perma.cc/X2E4-8SPG.

[17] *See Select Committee Seventh Hearing Transcript*, *supra* n.6 ("[Begin videotape] ROGER STONE: . . . . a thousand years of darkness.  MICHAEL FLYNN: . . . . We will not stand for a lie.  ALI ALEXANDER: . . . . we are going to shut this country down.  ALEX JONES: It's 1776, 1776, 1776, 1776. [End videotape].").

[18] *See Here's Every Word from the Sixth Jan. 6 Committee Hearing on its Investigation* ("*Select Committee Sixth Hearing Transcript*"), NPR (June 28, 2022), https://perma.cc/N98J-T8FL ("Ms. Hutchinson, Is it your understanding that President Trump asked Mark Meadows to speak with Roger Stone and General Flynn on January 5th?  CASSIDY HUTCHINSON: That's correct. That is my understanding.  LIZ CHENEY: And Ms. Hutchinson, is it your understanding that Mr. Meadows called Mr. Stone on the 5th?  CASSIDY HUTCHINSON: I'm under the impression that Mr. Meadows did complete both a call to Mr. Stone and General Flynn the evening of the 5th.").

[19] *See id.*

[20] *See Select Committee Seventh Hearing Transcript*, *supra* n.6 ("JAMIE RASKIN: Encrypted chats obtained by the Select Committee show that Kelly Meggs, the indicted leader of the Florida Oath Keepers, spoke directly with Roger Stone about security on January 5th and 6th.  In fact, on January 6th, Stone was guarded by two Oath Keepers who have since been criminally indicted for seditious conspiracy.").

accompanied by members of the Oath Keepers, including Roberto Minuta,[21] Joshua James,[22] and Brian Ulrich,[23] who have been charged with seditious conspiracy and other crimes in relation to the events on January 6th; Mr. James and Mr. Ulrich have pleaded guilty.[24]

  **B.**  **The Formation of the Select Committee**

  In response to the unprecedented attack on January 6th, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503 § 1.  The resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  H. Res. 503 § 4(a)(1)-(3).

  To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican and then consulted with the

---

[21] *See, e.g.*, Olivia Rubin *et al.*, *Authorities arrest Oath Keeper seen with Trump adviser Roger Stone on morning of insurrection*, ABC News (Mar. 8, 2021), https://perma.cc/SL7U-S8DQ.

[22] *See, e.g.*, Audrey Ash & Marshall Cohen, *Alleged Oath Keeper charged in Capitol riot chauffeured Roger Stone, FBI agent says*, CNN (Mar. 11, 2021), https://perma.cc/2RWG-4WMF.

[23] *See, e.g.*, Spencer S. Hsu, *Second Oath Keepers member pleads guilty to seditious conspiracy*, Wash. Post (Apr. 29, 2022), https://perma.cc/5RYD-WDMU.

[24] *See* U.S. Dep't of Just., *JAMES, Joshua* (Mar. 2, 2022), https://perma.cc/96PZ-2S37; U.S. Dep't of Just., *ULRICH, Brian* (Apr. 29, 2022), https://perma.cc/8TTJ-HJPA.

House Minority Leader, who recommended five additional Republicans.[25]  The Speaker then

spoke with the Minority Leader, advised that she would appoint three of those he had

recommended, and asked the Minority Leader to recommend two other Republicans.[26]  After the

Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the

Speaker named an additional Republican to the Select Committee.[27]  Since then, the Select

Committee has functioned with seven Democrats and two Republicans.

     **C.**      **The Select Committee's Subpoena to AT&T**

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack

on January 6th, the Select Committee has issued subpoenas to various government agencies,

private companies, and certain individuals.  The Select Committee served AT&T with a

subpoena seeking subscriber information, connection records, and records of session times and

durations of calls for the period of November 1, 2020, through January 31, 2021, for Drake

Ventures LLC's AT&T account (as noted earlier, no communications content or geolocation data

were sought).  *See* Compl. Ex. 1.

Mr. Stone and Drake Ventures LLC filed this case on February 24, 2022, ECF No. 1.

They ask this Court to declare that the AT&T Subpoena: "is ultra vires, unlawful, and

unenforceable"; "serves no valid legislative purpose and exceeds the Select Committee's

Constitutional authority"; is such that compliance "would violate the Stored Communications

---

[25] *See* Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release).

[26] *Id.*

[27] *See also* Press Release, Kevin McCarthy, House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Committee (July 21, 2021), https://perma.cc/4JNC-73R2.

Act"; "violates Mr. Stone's Fourth Amendment rights"; and "violates Mr. Stone's First Amendment and Due Process rights."  Compl. Prayer for Relief ¶¶ a-e.

Plaintiffs also ask this Court to issue an injunction "prohibiting AT&T from producing any phone data to the Select Committee and [requiring] that any data submitted be returned to the Plaintiff if produced or destroyed"; "prohibiting the Committee from using any phone data submitted by AT&T [to] the Select Committee and [requiring] that any data submitted be returned to the Plaintiff if produced or destroyed"; "quashing the AT&T Subpoena and prohibiting their [*sic*] enforcement by Defendants"; "prohibiting Defendants from imposing sanctions for noncompliance with the AT&T Subpoena"; and "prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the AT&T Subpoena." *Id.* ¶¶ f-g, i-k. Plaintiffs seek, "[i]n the alternative, an order modifying the AT&T Subpoena to seek only unprivileged information, in a specified date range (ex. January 1, 2021 09:00 AM to January 6, 2021 18:00 PM), that does not infringe on Mr. Stone's constitutional rights." *Id.* ¶ h.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

Plaintiffs' various theories have no merit, and this suit should be dismissed.

I.        **The Select Committee Is a Duly Authorized Committee**

Plaintiffs allege that the Select Committee was not validly formed and therefore lacked authority to issue the subpoena to AT&T for Plaintiffs' records.  *See* Compl. ¶¶ 32-38.  Plaintiffs are wrong.

As an initial matter, Plaintiffs' demand that this Court override the actions of the House and its Speaker for assertedly not following the Select Committee's authorizing resolution violates Constitutional separation of powers principles.  The Constitution's Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  It is settled law in this Circuit that the Clause "'clearly reserves to each House of the Congress the authority to make its own rules,' and . . . interpreting a congressional rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013) (noting that the Rulemaking Clause provides exclusive power to Congress to "make its own rules about its internal proceedings").  As the D.C. Circuit has explained, it is a "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks and citation omitted).

In addition, decisions by Congress interpreting its own rules are entitled to the "presumption in favor of regularity" that all government officials enjoy.  *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon matters within their constitutional authority.")  None of the allegations in the Complaint comes close to

demonstrating the "clear evidence to the contrary" required to overcome that presumption. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).

Regardless, Plaintiffs' challenges to the Select Committee's composition and subpoena authority are deeply flawed.

*First*, Plaintiffs contend that Speaker Nancy Pelosi's appointment of nine members to the Select Committee was not "consistent with the authorizing resolution of the Select Committee" because "the authorizing resolution instructs the Speaker 'shall' appoint thirteen members." Compl. ¶ 36. Plaintiffs are incorrect.

By way of background, the House has four different kinds of committees, each of which is established and governed by various House Rules, statutes, and House resolutions, or on an *ad hoc* basis. *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021) (House Rules) (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31). The House rules and procedures governing appointments to these four distinct types of committees vary. Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here. *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House."). And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House." *See* 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Plaintiffs' attack on the composition of the Select Committee fails. House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom

shall be appointed after consultation with the minority leader." H. Res. 503 § 2(a). The Resolution does not require that *all* thirteen Members be appointed for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, interpretation of House rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members. Specifically, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here. *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the Speaker[.]"). Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party. *See* H. Rep. No. 109-377, at ii (2006) (listing Members). Notably, that select committee likewise issued subpoenas. *See id.* at 23 (noting that the Katrina Select Committee issued a subpoena to the Department of Defense, and that the Department complied). This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies," but provides no specific timeline for filling them. *See* H. Res. 503 § 2(c). Nor does House Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members. *See id.*

Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges Plaintiffs raise here. For example, when the full House debated the resolutions recommending referral of Stephen

Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[28]  The full House nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[29]  The interpretive arguments Plaintiffs now present have thus been rejected by the Select Committee, the Rules Committee, the House Parliamentarian, the Speaker, and the full House of Representatives.  The full House's ratification of the referrals reinforces that Plaintiffs' objections to the Select Committee's composition cannot be accepted.

It is thus no surprise that every district court to have considered Plaintiffs' argument— including this one—has rejected it.  As Judge Kelly of this district recently explained, "the House views the Select Committee to be duly constituted and empowered to act under its

---

[28] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate.  It has violated its own rules of creation.  It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6.  You can't have a committee to find out what happened because you are interested.  You can't do that. And that is what they are doing today.") (statement of Rep. Biggs); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members") (statement of Rep. Banks); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Stephen Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative  purpose") (statement of Rep. Banks).

[29] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino).  These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee and approved by the full House.  *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." *Repub. Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, 2022 WL 1294509, at *15 (D.D.C. May 1, 2022), *appeal pending*, No. 22-5123 (D.C. Cir.).

In rejecting the argument that House rules mandated that the Speaker appoint exactly thirteen Members to the Select Committee, Judge Kelly further explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate." *RNC*, 2022 WL 1294509, at *15.  Judge Kelly concluded that if he accepted the argument (which is identical to Plaintiffs' argument here) about the Select Committee's composition, he "would be 'interpret[ing] the Rule differently than . . . the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Id.* (quoting *Rostenkowski*, 59 F.3d at 1306-07).[30]

In *United States v. Bannon*, No. 21-670 (D.D.C.), this Court endorsed Judge Kelly's reasoning and holding on this issue.  *See* Mot. Hr'g Tr. at 114:9-116:9 (June 15, 2022); Mot.

_____

[30] In *RNC*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest."  2022 WL 1294509, at *2 (citations omitted).  Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein.  As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required.  *See also* Defs.' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF No. 15.

13

Hr'g Tr. at 130:22-131:24 (July 11, 2022).[31]  Mr. Bannon was subsequently convicted on two

counts of contempt of Congress.  *See* Verdict Form, ECF No. 135 (July 22, 2022).

*Second*, Plaintiffs complain that, "of those nine members Speaker Pelosi has appointed,

none of them was appointed after consultation with the minority member [*sic*], as is required by

the authorizing resolution."  Compl. ¶ 37; *see also id.* ¶ 33 (noting that "[n]one of these members

was appointed from the selection of five GOP Congresspersons put forth by Republican Minority

Leader Kevin McCarthy").

But the power to appoint Members to select committees rests exclusively with the

Speaker of the House.  *See* House Rule I.11 ("The Speaker shall appoint all select, joint, and

conference committees ordered by the House."); 167 Cong. Rec. H37 (daily ed. Jan. 4, 2021)

(authorizing Speaker to "accept resignations and to make appointments authorized by law or by

the House"); *see also* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172

(citing "[i]nstances in which the majority declined to recognize minority recommendations for

committee assignments").

House Resolution 503 is not to the contrary.  When creating the Select Committee, the

House only required that Members be chosen "after *consultation* with the Minority Leader," H.

Res. 503 § 2(a) (emphasis added), which allows the Speaker greater authority regarding the

appointment of minority party Members.  *See United Keetoowah Band of Cherokee Indians in*

*Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or

information of.'" (internal quotation marks omitted)); *Consultation*, Black's Law Dictionary

---

[31] In addition, before the decision in *RNC*, two other district courts had reached the same
conclusion.  *See* Oral Arg. Tr. at 34, *Budowich v. Pelosi*, No. 21-3366 (D.D.C. Jan. 20, 2022),
ECF No. 27; Order Den. Pl.'s Mot. for Prelim. Inj. at 9 n.12, *Eastman v. Thompson*, No. 22-99
(C.D. Cal. Jan. 25, 2022), ECF No. 43.

(11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").

Had the House intended a binding role for the Minority Leader, it could have provided for such a requirement, as it has in the past. *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019) (Select Committee on the Climate Crisis required that a portion of the Members be appointed by the Speaker "on the recommendation of the Minority Leader"); *id.* at § 201(b)(3) (same requirement for Select Committee on the Modernization of Congress). Similarly, had the House wanted to delegate appointment power directly to the Minority Leader, it could have done so, as it also has in the past. *See, e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance Commission and allowing nine Members to "be appointed by the Minority Leader of the House of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted, *see supra* at 10-11. The fact that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021 Order of the House; and House Resolution 503—made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.

## II.    The Subpoena Is Not Overly Broad or Beyond the Scope of the Select Committee's Jurisdiction

Congress's broad power of investigation is firmly established. The Supreme Court has confirmed that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). "This power, deeply rooted in American and English institutions, is indeed co-extensive with the power to legislate." *Quinn v. United States*, 349 U.S. 155, 160 (1955). "Without the power to investigate . . . Congress could be seriously handicapped in its efforts to exercise its

15

constitutional function wisely and effectively."  *Id*. at 160-61.  This "broad" and "indispensable"

power "encompasses inquiries into the administration of existing laws, studies of proposed laws,

and surveys of defects in our social, economic or political system for the purpose of enabling the

Congress to remedy them."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal

quotation marks and citation omitted).

Plaintiffs argue that House Resolution 503 is "overly broad" and that "[t]he AT&T

Subpoena dates are a violation of" that resolution.  Compl. ¶ 39.  Plaintiffs' sole example of the

alleged overbreadth of House Resolution 503 is that it "address[es] even the coronavirus

pandemic."  *Id.*  This appears to refer to one of several "Whereas" clauses at the beginning of the

Resolution, about ongoing threats in the wake of January 6th:

> Whereas, on January 27, 2021, the Department of Homeland Security issued a
> National Terrorism Advisory System Bulletin that due to the "heightened threat
> environment across the United States," in which "[S]ome ideologically-motivated
> violent extremists with objections to the exercise of governmental authority and
> the presidential transition, as well as other perceived grievances fueled by false
> narratives, could continue to mobilize to incite or commit violence."  The Bulletin
> also stated that—
>
> (1) "DHS is concerned these same drivers to violence will remain through early
> 2021 and some DVEs [domestic violent extremists] may be emboldened by the
> January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C. to target
> elected officials and government facilities."; and
>
> (2) "Threats of violence against critical infrastructure, including the electric,
> telecommunications and healthcare sectors, increased in 2020 with violent
> extremists citing misinformation and conspiracy theories about COVID-19 for
> their actions."

H. Res. 503 at 1-2 (alterations in original).  Plaintiffs do not (and cannot) provide any

argument as to why this language makes the Resolution overly broad, or even suggest

that it has any application to the subpoena in question.  As the D.C. Circuit recently

noted, "Congress's power to obtain information is broad and indispensable, and

encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump v. Thompson*, 20 F.4th at 24 (internal quotation marks, alterations, and citations omitted).

Furthermore, the dates covered by the subpoena—November 1 to January 31— are entirely consistent with the scope of that Resolution. The January 6th attack did not materialize out of thin air. It was the culmination of months of efforts to delegitimize the results of the Presidential election—an effort that began before the November 3, 2020, election even took place. *See, e.g.*, Barton Gellman, *The Election That Could Break America*, The Atlantic (Sept. 23, 2020).[32] The Select Committee is investigating the relationship between the attack and the massive efforts to undermine the election results in the two months following Election Day.

House Resolution 503 established the Select Committee "[t]o investigate and report upon the facts, circumstances, and *causes* relating to the January 6, 2021 domestic terrorist attack upon the United States Capitol Complex." H. Res. 503 § 3(1) (emphasis added); *see also id.* § 4(a)(1). Looking back to November 1, as this subpoena does, is in no way beyond the scope of the Resolution. Likewise, looking forward to January 31 is appropriate to determine whether any communications in the wake of the attack shed any light on its "facts, circumstances, and causes." *Id.*

### III.    The Subpoena Does Not Violate the Fourth Amendment

Plaintiffs' argument that the subpoena violates the Fourth Amendment because it is "so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee,"

---

[32] *Available at* https://perma.cc/HW2H-YM5Q.

Compl. ¶ 57, is mistaken.  A subpoena is not impermissibly overbroad if its call for documents or testimony is within the scope of the Congressional inquiry at issue.  *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).  The Select Committee's inquiry includes examining the January 6th attack as well as its "circumstances" and "causes," to inform a consideration of "changes in law, policy, procedures, rules, or regulations."  H. Res. 503 §§ (3)(1), 4(c).  Given that scope, the subpoena is appropriately tailored to meet the Select Committee's mandate and is not impermissibly broad.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 509 (1975).  Because the seeds of the January 6th attack appear to have been planted months earlier, it is entirely appropriate to examine records dating back to November.

Plaintiffs improperly rely on the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  *See* Compl. ¶ 53.  *Carpenter*, by its own terms, does not apply to the records the subpoena seeks.  In that case, the Supreme Court faced the question of whether the Government's collection of historical cell-site location information ("CSLI") from a third-party telecommunications company constituted a "search" under the Fourth Amendment.  138 S. Ct. at 2211.  The Court had previously held in *Smith v. Maryland*, that recording the numbers that a particular phone number dialed did not constitute a search because, among other reasons, such records were voluntarily disclosed to the phone company and thus there was no reasonable expectation of privacy in them.  442 U.S. 735, 743-44 (1979).

In *Carpenter*, although historical CSLI data was in the possession of a third-party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance."  *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added).  In particular, the Court distinguished historical CSLI from the "limited capabilities of a pen register," which

consisted of "telephone call logs [that] reveal little in the way of 'identifying information.'" *Id.* at 2219 (citation omitted).

The AT&T subpoena at issue here seeks only subscriber information, connection records, and records of session times and durations. *See* Compl. Ex. 1. It does not seek historical CSLI or the contents or substance of any communications. *See id.* The records sought by the Select Committee, therefore, are governed squarely by *Smith*, not *Carpenter*. *See Carpenter*, 138 S. Ct. at 2210 (stating that decision is a "narrow" one that "does not disturb the application of *Smith*").[33]

Courts addressing suppression motions after *Carpenter* have consistently held that the decision does not apply to the kinds of records sought here, such as subscriber information and call-detail records. *See, e.g.*, *United States v. Beverly*, 943 F.3d 225, 239 (5th Cir. 2019) (holding *Carpenter* does not apply to subscriber information and call-detail records, and declining to assume that such records may be used to track location); *United States v. Searcy*, No. 19-135, 2021 WL 3616062, at *5 (W.D. Pa. Aug. 16, 2021) ("Except for CSLI . . . Mr. Searcy has no legitimate expectation of privacy in information he voluntarily turns over to third parties[.]" (internal quotation marks and citation omitted)); *Brown v. Sprint Corp. Sec. Specialist*, No. 17-CV-2561, 2019 WL 418100, at *4 (E.D.N.Y. Jan. 31, 2019) (holding *Carpenter* does not apply to subscriber and call-detail records).

---

[33] Plaintiffs attempt to elide the distinction between historical CSLI and other phone records that are governed by *Smith*, alleging that the subscriber and call-detail records "*can* be used for historic mobile site analysis." Compl. ¶¶ 44, 49 (emphasis added). But the phone number itself could serve the same purpose—law enforcement could simply request historical CSLI from a telecommunications carrier for a particular phone number. The additional subscriber and call-detail information would not provide any additional mechanism for obtaining historical CSLI or evading the warrant requirement set forth in *Carpenter*.

Thus, *Carpenter* simply does not apply to the third-party AT&T subpoena here, and the AT&T subpoena does not violate Plaintiffs' Fourth Amendment rights.  Judge Kelly reached the same conclusion in *RNC*, in which the plaintiff had argued that *Carpenter* applied.  *See* 2022 WL 1294509, at \*23-24; *see also* Mem. P. & A. in Supp. of Pl.'s for Prelim. Inj., ECF No. 8, at 14 (Mar. 15, 2022); Reply Mem. P. & A. in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 21, at 13, 15-16 (Mar. 29, 2022).  Judge Kelly applied *McPhaul*, and concluded that "the subpoena is not more sweeping than the one sustained against challenge in *McPhaul*," and thus "the Court cannot say that the breadth of the subpoena is such as to violate the Fourth Amendment."  2022 WL 1294509, at \*24 (internal quotation marks and alteration omitted).

## IV.    The Subpoena Does Not Violate the First Amendment

Plaintiffs' argument that the subpoena to AT&T violates the First Amendment is squarely foreclosed by *Eastland*, 421 U.S. at 509-10.  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [its] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Id.* at 509 n.16.  Here, too, Plaintiffs' First Amendment arguments against enforcement of the Select Committee's subpoena must be rejected.

Even if their claim were subject to a balancing test, it would still fail: the balancing of "the competing private and public interests at stake" here plainly favors the Select Committee. *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  This Court has rejected claims that issuance of a Congressional subpoena violates a respondent's First Amendment rights.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 138 (D.D.C. 2016), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).  That conclusion is entirely consistent with the Supreme Court's recognition that the public interest is extremely high when the focus is on ensuring "the free

functioning of our national institutions."  *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (internal

quotation marks omitted).  The Select Committee is doing precisely that by seeking the records

at issue here.

      Plaintiffs fail to assert any First Amendment interest that could outweigh the very grave

public interest here.  Assertions that Mr. Stone's associational rights would suffer infringement,

*see* Compl. ¶¶ 67-68, and that "[s]ome colleagues, business prospects, former clients, and

associates" are allegedly reluctant to speak to him, *id.* ¶ 65, do not suffice to make out a First

Amendment claim.  *See Buckley*, 424 U.S. at 74 (showing an associational injury requires

demonstrating a "reasonable probability that the compelled disclosure . . . will subject them to

threats, harassment, or reprisals from either Government officials or private parties"); *Brock v.*

*Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988)

(reviewing case law and noting that courts have "emphasized in each of those decisions . . . the

need for objective and articulable facts, which go beyond broad allegations or subjective fears

. . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of

associational rights").

      Assuming for purposes of argument that Plaintiffs could substantiate a legitimate interest

implicated by the subpoena, it would be outweighed by the Select Committee's "uniquely

weighty interest in investigating the causes and circumstances of the January 6th attack."  *Trump*

*v. Thompson*, 20 F.4th at 35.  Here, the Select Committee's subpoena seeks records relevant to

determining the root causes of the violent January 6th attack on Congress itself and the

constitutional responsibility to officially count Presidential electoral votes.  To determine the

extent of Mr. Trump's and his allies' efforts to implement the planning for the violent attack and

the attack itself, the Select Committee requires a record of relevant communications.  This is a

paradigmatic example of the governmental interest in the "free functioning of our national institutions." *Buckley*, 424 U.S. at 66.  Accordingly, Plaintiffs' First Amendment claim fails.[34]

## V.  The Stored Communications Act Does Not Limit the Select Committee's Authority to Obtain Non-Content Information from AT&T Pursuant to a Lawful Subpoena

Plaintiffs assert in passing that the Select Committee's subpoena to AT&T violates the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq*., but they make no attempt to explain why.  *See* Compl. at 4, ¶ 9, Prayer for Relief ¶ c.  That claim—even assuming it is properly made—is wrong as a matter of law.  Nothing in the Act limits the ability of a Congressional committee to obtain non-content information from a "person or entity providing an electronic communication service to the public" via a lawful, duly authorized subpoena.  18 U.S.C. § 2702(a)(1).

The Stored Communications Act generally allows disclosure of non-content records, although it prohibits (with one exception) voluntary disclosure of non-content records to "governmental entit[ies]."  18 U.S.C. § 2702(a)(3), (c)(4).  The definition of the term "governmental entity," as used in the Act, does not include Congress.  *Id.* §§ 6, 2711(4).  And the Act expressly *permits* disclosure to "any person other than a governmental entity."  *Id.* § 2702(c)(6).

The statute's definitional terms make clear that Congress did not intend for the phrase "governmental entity" to include Congress.  *See Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) ("'When a statute includes an explicit definition, we must follow that

---

[34] Plaintiffs' allegations that the Select Committee's true purpose in issuing the subpoena is to "build[] an opposition research file for the 2022 and 2024 election cycle," Compl. ¶ 77, and to "chill the speech of the Select Committee Members['] political adversaries," *id.* ¶ 81, are both completely false and not judicially cognizable: "so long as Congress acts in pursuance of its constitutional power . . . the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power."  *Ferrer*, 199 F. Supp. 3d at 143 (quoting *Barenblatt*, 360 U.S. at 132-33) (alterations omitted).

definition,' even if it varies from a term's ordinary meaning."). The Act defines "governmental entity" as "a department or agency of the United States or any State or political subdivision thereof." 18 U.S.C. § 2711(4). The terms "department" and "agency" have particular meanings in Title 18, as defined in Section 6. That provision defines "department" as "one of the *executive* departments enumerated in section 1 [now § 101] of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government." *Id.* § 6 (emphasis added). It likewise defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense." *Id.* The Select Committee is neither an executive department nor a governmental agency, and no "context" in the Stored Communications Act suggests that those terms apply to Congress.

The Supreme Court addressed a similar issue of statutory interpretation regarding the phrase "any department or agency of the United States" in *Hubbard v. United States*, 514 U.S. 695, 704 (1995). That case concerned the applicability of 18 U.S.C. § 1001, forbidding making false statements to "any department or agency of the United States," to the Judicial Branch. *Id.* at 698. The Court noted initially that the definitions in Section 6 presumptively applied to "all of Title 18," including Section 1001. *Id.* at 700. The Court stated it was "incontrovertible" that "agency" did not refer to any court within the Judicial Branch. *Id.* The Court further concluded that nothing in the context of Section 1001 "shows that" the term "department" was intended to apply beyond the Executive Branch. *Id.* (quoting 18 U.S.C. § 6). The Court stated that there is

"nothing in the text of the statute, or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." *Id.* at 701.[35]

As in *Hubbard*, the Act's definition of "governmental entity" and the definition contained in Section 6 make plain that the term "governmental entity" does not apply to Congress. There is nothing in the Act that even suggests, let alone "shows," that Congress intended to include itself in the definition. Moreover, the statute contains other provisions that further reinforce this plain meaning.

The Act provides that in the case of willful or intentional violations, the "head of the department or agency" in which the violation occurred may subject the violator to administrative discipline. 18 U.S.C. § 2712(c). But the leadership of Congress and its committees do not constitute a "head" of an agency or department. As the Supreme Court long ago established, "[t]he term 'head of a department' means . . . the Secretary in charge of a great division of the *executive branch* of the government, like the State, Treasury, and War, who is a member of the Cabinet." *Burnap v. United States*, 252 U.S. 512, 515 (1920) (emphasis added); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 642 (2d Cir. 2019) (holding that use of term "head of the agency or department" indicated Congress did not intend Right to Financial Privacy Act to apply to Congressional committee), *vacated on other grounds by Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *see also* Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev.

---

[35] *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), which held that the statute applied to false statements made to the Legislative Branch. 514 U.S. at 715. The *Hubbard* Court stated that *Bramblett* "erred by giving insufficient weight to the plain language of §§ 6 and 1001," resulting "in a decision that is at war with the text of not one, but two different Act of Congress." *Id.* at 702, 708. After the ruling in *Hubbard,* Congress amended the statute at issue, 18 U.S.C. § 1001. *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292, § 2, 110 Stat 3459.

24

1799, 1825-34 (2021) (surveying statutory text, context, and legislative history and concluding that in the Stored Communications Act Congress intended to exempt itself from the term "governmental entity").

Accordingly, the plain text of the Stored Communications Act, as well as the overall context and structure of the statute, make clear that Congress is not a "governmental entity" as that term is defined in the Act.  As a result, because the Act expressly permits disclosure of non-content records to "any person other than a governmental entity," 18 U.S.C. § 2702(c)(6), the statute cannot be read to prohibit their disclosure to the Select Committee.

## CONCLUSION

For the reasons stated above, this Court should dismiss the Complaint in its entirety.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

John A. Freedman[*]
Paul Fishman[*]
Amy Jeffress[*]
David J. Weiner[*]
John M. Hindley[*]
ARNOLD & PORTER KAYE SCHOLER LLP

25

601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com
David.Weiner@arnoldporter.com
John.Hindley@arnoldporter.com

SHER TREMONTE LLP
Justin M. Sher[*]
Michael Tremonte[*]
Noam Biale[*]
Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

Dated: July 22, 2022

* Appearing pursuant to 2 U.S.C. § 5571(a).

26

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter___*
Douglas N. Letter