**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROGER J. STONE, JR,
DRAKE VENTURES, LLC

Plaintiffs,

v.

ADAM B. SCHIFF, et. al.

Defendants.

Civil Case No. 1:22-CV-00492-CJN

---

**PLAINTIFFS' MEMORANDUM IN RESPONSE
<u>IN OPPOSITION TO MOTION TO DISMISS</u>**

Plaintiffs ROGER STONE, Jr. and DRAKE VENTURES, LLC, responds to Congressional Defendants' motion to dismiss [ECF No. 18].

**INTRODUCTION**

Congressional Defendants assert facts that are not in evidence or even pled. Roger Stone did not play a key role in setting the stage for the January 6th attacks, this is not a fact that any court has found. *See* Def. Mem. at 1. If the Congressional Defendants intend to make these unfounded allegations, these allegations must be asserted in an answer and affirmative defenses, this is not the appropriate place. Although distasteful to some, Stone's speech is protected by the First Amendment and congressional investigations are not authorized to trample on any constitutional right. Stone has stated a claim for which relief can be granted. If the Congressional Defendants disagree with the allegations, it must answer them and litigate those claims.

The Congressional defendants' attack misses the mark.  In the first place, neither of these named Plaintiffs "tried to overturn an election" any more than any of the defendants did so when they raised objections to the validity of electors in past elections; instead, they peacefully exercised their First Amendment rights to promote the integrity of the 2020 presidential election.

Plaintiffs' Complaint challenges the Congressional Defendants' subpoenas to AT&T to turn over their phone records to the Select Committee, alleging facts supporting Four Counts. First, the AT&T subpoenas were not validly issued by a duly authorized committee and thus was *ultra vires*.  Second, the AT&T subpoenas are overly broad and beyond the scope of the committee's jurisdiction.  Third, the AT&T subpoenas violate the Fourth Amendment and the Stored Communications Act.  Fourth, the Select Committee is a federal government body actively abridging Plaintiffs' First Amendment rights, and setting a chilling effect on the exercise of those rights.  Since the Third Count covers both a statutory and constitutional claim, they will be addressed below separately, as they were by the Congressional Defendants.

As will be demonstrated, Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," to survive Congressional Defendants' Motion to Dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   This is the standard of review offered by the Congressional Defendants, Def. Mem. at 9-10, and the standard that Plaintiffs easily meet. Accordingly, Stone requests this Court to deny Congressional Defendants' Motion to Dismiss.

## BACKGROUND

Roger Stone disagrees with the Congressional Defendants' mischaracterization of the extent of his involvement in the events of January 6, 2022. All of Stone's involvement, none on January 6, was anything but protected First Amendment speech. None of it ever called others to

violence. Citing to online citations to media outlets claiming Stone used language encouraging others to protest such as 'fight for America,' or along the lines of 'Give me liberty, or give me death,' is not an example that supports encouragement, aiding or abetting anyone who breached the Capitol on January 6. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982).

There is a distinction between political hyperbole, which is protected speech, and true threats. *Watts v. United States*, 394 U.S. 705, 708 (1969). "For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Id.* (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). Nonetheless, Congressional Defendants write:

> January 6th was the culmination of months of organized attacks on the legitimacy of the 2020 presidential election and false claims about its winner.  Mr. Stone, a longtime political adviser to former President Donald Trump played a key role in these efforts. Mr. Stone lead the "Stop the Steal" movement.

Def. Mem. at 2.

Roger Stone had neither planned a January 6th event and was nowhere near the Capitol on that day. January 6th was not "months of organized attacks" in the making.  There are no facts pled in the complaint that would indicate Mr. Stone had anything to do with the so called "Stop the Steal" movement. This is the wrong time for defendants to raise this speculative allegation.

Yet Congressional Defendants claim:

> During, at a minimum, the period between the November 3, 2020 election and January 6, 2021, Plaintiff communicated with leaders of two violent extremist groups, the Proud Boys and Oath Keepers, regarding security at events intended to challenge or undermine the results of the  Presidential election.6  One series of events included rallies outside government buildings in  Atlanta, Georgia, around November 18 through November 21, 2020, which were led in part

> by "Stop the Steal" co-founder Ali Alexander and radio show host
> Alex Jones, and involved Proud Boys leader Enrique Tarrio.

Def. Mem. at 3.

These alleged associations and communications are protected by the First Amendment and should not subject Stone's phone records to congressional scrutiny. *Claiborne Hardware Co.*, 458 U.S. at 920.

As will be demonstrated, the AT&T subpoena at issue has no limits, exceeds pertinence, and is not limited to those interactions that he might have been with other targets of the Committee—which there is no evidence to suggest exists—it sweeps up all of Stone's personal, ministerial, privileged communication, and professional network as well.

The Committee attempts, again, to make a criminal conspiracy out of Stone exercising his First Amendment rights by allegedly obtaining permit(s), hiring event planners to coordinate with law enforcement and appropriate officials, and recognizing the legal process for constitutional objections. There are no facts pled or in evidence to establish that Mr. Stone undertook any of the alleged activities.

Congressional Defendants' attempts to link media articles and claims, disguised as evidence, that have little to nothing to do with accusations against Stone is designed to mislead this Court by casting aspersions on Stone's character with misleading characterizations. None of this justifies or speaks to the justifications or the scope of the AT&T Subpoena. It is tantamount to name calling, guilt by association, and seeks to prejudice this Court against Stone and his civil Constitutional rights.

## ARGUMENT

**I. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE AT&T SUBPOENAS WERE NOT VALIDLY ISSUED BY A DULY AUTHORIZED COMMITTEE, AND THUS WERE *ULTRA VIRES*.**

In Count I of their Complaint, Plaintiffs allege that the AT&T subpoenas were not valid because the Select Committee that issued them was not constituted in accordance with H. Res. 503: "Appointment Of Members.—The Speaker **shall appoint 13 Members** to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021) (emphasis added). Compl. ¶ 32. Speaker Pelosi has appointed only nine members to the Select Committee: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP Congresspersons put forth by Republican Minority Leader Kevin McCarthy. Compl. ¶ 33. While authorized congressional committees have subpoena authority implied by Article I of the Constitution, *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927), the Select Committee is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

The Congressional Defendants move to dismiss this Count arguing that Speaker Pelosi has the discretion to appoint any number less than 13 Members to the Committee, whether nine as she did, or five or even one. *See* Def. Mem. at 7. The Congressional Defendants' citation to other Congressional committees, such as the Hurricane Katrina Select Committee, that were not fully staffed as constituting precedent in this case, *id.* at 11, is not dispositive since there was no legal challenge to the subpoenas issued by those committees. *Cf. Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting that the Committee be equally meticulous in obeying its own rules."); *Liveright v. United States*, 347 F.2d 473 (D.C. Cir. 1965); *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963).

"The word 'shall' is the language of command," *Ass'n of Am. Railroads v. Castle,* 562 F.2d 1310, 1312 (D.C. Cir. 1977), and carries a mandatory connotation. On the rare occasions in

5

which courts have found the word's application to be uncertain, the ambiguity arose from its juxtaposition with related provisions (usually of a statute) that were phrased in directory or discretionary terms. *See, e.g., Samaritan Health Ctr. v. Heckler,* 636 F. Supp. 503, 515 (D.D.C. 1985) (finding potential ambiguity "where 'shall' is joined with a phrase that implies discretion").

There is no such obscurity in H. Res. 503. Its instructions that the Speaker *shall* appoint 13 members-five of whom *shall* be selected in consultation with the minority leader-are susceptible to no reasonable interpretation other than what their plain language imparts: the Select Committee *must* be constituted in conformance with H. Res. 503's plain terms.

Prior to the filing of the Select Committee's Motion to Dismiss, this Court ruled from the bench on June 15, 2022, against Defendant Steven Bannon's similar argument in his criminal contempt case after oral argument.  In *United States of America v. Steven K. Bannon*, Criminal Action No. 21-00670-RJN (D.D.C.), this Court declined to dismiss the indictment against Mr. Bannon, who had argued, *inter alia,* that:

> [T]he composition of the Select Committee invalidates the subpoena.  As [Bannon] notes, House Resolution 503, the resolution that authorized the Select Committee, provides that, "The Speaker shall appoint 13 members to the Select Committee, -- five of whom shall be appointed after consultation with the minority leader.". . .  Mr. Bannon argues the Speaker rejected the nominees suggested by the minority leader, and the Committee has never operated with 13 members. . . .  Even assuming the truth of Mr. Bannon's contention of there being less than 13 members of the Committee while, of course, those numbers are not in the indictment, the government at least does not dispute them.  It is not a basis by which this Court can or will dismiss the indictment.

*USA v. Bannon*, No. 21-00670, Transcript of June 15, 2022, Hearing, pp. 113-114.

In so ruling, the Court issued this caveat:  "And that is not to say that the argument is unreasonable.  Indeed, I agree with Judge Kelly, who recently dealt with similar arguments in another case[, *Republican National Committee v. Nancy Pelosi et al.*, Civil Case No. 22-00659,] that this is **'not an unreasonable – position,'** as Judge Kelly put it.  But the Court cannot

conclude, as a matter of law, that the Committee was invalidly constituted such that dismissal of the indictment is warranted." *Id*. at 114 (emphasis added).

The reason for this inability to dismiss the indictment, according to the Court, is that:

> [T]he word "shall," although usually mandatory, can sometimes mean "should," "will" or even "may," as the Supreme Court stated in *Gutierrez de Martinez versus Lamagno*.   Though "shall" generally means "must," legal writers sometimes use or misuse "shall" to mean "should," "will" or even "may."  That's a quote from the Supreme Court. . . .And given this potential ambiguity, the Court agrees with Judge Kelly that it must give great weight to the interpretation of those House members charged with implementing the resolution and to the House itself.  This reading, the reading applied by the Speaker, appears to be that in the context of this resolution, and "the Committee shall" means "may or should"; that reading appears to have been **ratified by the full House several times** . . . .  and there would be potential separation of powers issues, should this or any other court reject a congressional interpretation of its own rule. . . .  As such, the Court cannot conclude, as a matter of law, that the composition of the Select Committee renders the Subpoena invalid such that dismissal of the indictment is warranted.

*Id*. at 115-116 (emphasis added).

This Court should not follow Judge Kelly's ruling in *Republican National Committee v. Nancy Pelosi at al.* for at least four compelling reasons. *First*, Judge Kelly's ruling in *Republican National Committee* ("RNC") is pending appeal.  On May 24, 2022, the U.S. Court of Appeals for the District of Columbia Circuit granted RNC's Emergency Motion for Administrative Injunction and Injunction Pending Appeal  *Republican National Committee v. Nancy Pelosi et al.*, No. 22-5123, Order (D.C. Cir. May 24, 2022).  Plaintiffs suggest that this Court may hold in abeyance its ruling in the instant case pending disposition of the appeal in *RNC*.

*Second,* unlike the subpoena in *Bannon,* the AT&T subpoenas have **not** been "ratified" by the full House which may conclude that such blanket subpoenas to approximately 100 private citizens for their phone records are overbroad or exceed the scope of the Select Committee's authority.  There is additionally no evidence that the full Select Committee took any steps to ratify any subpoena as it relates to Stone.  It is entirely possible that this subpoena was only the

work of the Chairman whose signature is on the document.  In any event, there is no legal doctrine of ratification of the acts of a committee that has not been duly constituted in the first place.

Third, in *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417 (1995), the case cited by this Court during the Bannon hearing, Justice Ginsburg, writing for the five-justice majority (Justices Stevens, O'Connor, Kennedy, and Breyer; Justice Souter filed a dissenting opinion, in which Chief Justice Rehnquist and Justices Scalia and Thomas joined), suggested that, "Any doubt as to the commanding force of the word, 'shall' . . . is dispelled by this further feature:  the Westfall Act's predecessor, the Federal Drivers Act, provided for court review of 'scope of employment' certifications at the tort plaintiff's behest."  Justice Ginsburg explained in a footnote: "Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may'."  515 U.S. at 432, n. 9 (citations omitted).  This footnote is *dictum* at best, and no reason to dismiss Plaintiffs' complaint in this civil action, especially as the Congressional Defendants bear the burden of persuading the Court to dismiss this action, which action raises, among other important issues, the same "not an unreasonable position" about the composition of the Select Committee recognized but rejected by Judge Kelly on grounds of separation of powers.  The Congressional Defendants in their Memorandum in Support of Motion to Dismiss this action have not even raised the separation of powers issue.

Fourth, in *RNC v. Pelosi*, the Court dismissed the allegations against the House Defendants based on immunity from suit under the Speech and Debate Clause, a defense not raised in this case, and dismissed the Stored Communications Act allegations against Salesforce as moot based on the two co-defendants having narrowed the issues "after discussions between the Select Committee and Salesforce."  Mem. Op. at 13.  In so holding, the Court acknowledged

the importance of the issues raised, highlighting one of the constitutional claims: "the RNC identified important First Amendment interests implicated by the subpoena that would have presented a much different question for the Court had the materials at issue not been narrowed after discussions between the Select Committee and Salesforce." *Id*.   No such narrowing of the subpoenas has occurred in this case.

In short, Plaintiffs have alleged a plausible claim that the Select Committee was not established according to H. Res. 503 requiring 13 Members, five of which were required to be appointed in consultation with the Minority Leader.  Accordingly, this claim survives a Motion to Dismiss for Failure to State a Claim.

## II. THE PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE SELECT COMMITTEE DOES NOT HAVE A VALID LEGISLATIVE PURPOSE AND THUS THE SUBPOENAS ARE OVERLY BROAD AND BEYOND THE PROPER SCOPE OF THE COMMITTEE.

The Select Committee has not met its burden of establishing a valid legislative purpose to support its subpoenas directed at Plaintiffs.  In the interests of judicial economy, Plaintiffs adopt the arguments presented by Plaintiff Mark Meadows in his reply brief in the related case before this Court in *Meadows v. Pelosi*, Case No. 1:21CV3217 (CJN) (ECF No. 38).

As Mr. Meadows argued, Judge Kelly's decision in the *Republican National Committee. v. Pelosi ("RNC")*, No. 22-659 (D.D.C.), upon which the Select Committee chiefly relies, is not binding, and respectfully, wrong on legislative purpose.  But more importantly, the D.C. Circuit has effectively stayed that ruling based on an apparent determination that the RNC is likely to succeed on the merits of its appeal.  *See* Order, *Republican Nat'l Comm. v. Pelosi*, No. 22-5123 (D.C. Cir. May 25, 2022).  Neither *RNC*, DDC No. 22-659 nor *RNC*, D.C. Cir. No. 22-5123, provides a basis to relieve the Select Committee's obligation to substantiate how these Plaintiffs' phone records would aid Congress in its lawmaking function.

9

While it is true that House Resolution 503 established the Select Committee "[t]o investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex," H. Res. 503 § 3(1), the Supreme Court reiterated that "'there is no congressional power to expose for the sake of exposure,'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins* v. *United States*, 354 U.S. 178, 200 (1957)), and that "Congress may not issue a subpoena for the purpose of 'law enforcement,'" *id.* (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). It has been clear for quite some time that the Select Committee has shared information with law enforcement, which is clearly not covered within potential "legislative proposals." The Congressional Defendants have not identified any draft legislation that would be better informed by Plaintiffs' phone records, or any conceivable legislative initiative.  By contrast, in the litigation culminating in *Trump v. Mazars*, 140 S. Ct. 2019 (2019), the House was able to identify several pending legislative proposals related to the inquiry, including proposed legislation to require Presidential candidates to disclose tax returns (with President Trump's tax returns being the specific subject of the subpoena). *See generally Trump v. Mazars USA, LLP*, 940 F.3d 710, 727 (D.C. Cir. 2019), vacated and remanded, 140 S. Ct. 2019 (2020). There is no such legislation in this case.  Additionally, learning who Mr. Stone was in communication with could not lead to any legislation other than legislation which would abridge a person's rights with whom to communicate.

If the legislative purpose is to prevent further attacks on the Capitol (or the Supreme Court), whether motivated by political beliefs on either the left or right that Congress believe are not legitimate, the only remedies to address those harms would be (1) to enact legislation establishing an arbiter of speech to restrict the content of social media that would motivate such

protestors, which would be wholly inimical to the First Amendment, and/or (2) provide better security, which was woefully lacking on January 6 despite intelligence showing that a large crowd was planning to assemble at the Capitol and that violence was possible.   The January 6 hearings heretofore have not focused on the only legitimate legislative purpose:  why was the Capitol vulnerable to attack and how can Congress improve its security to prevent any future attacks. Fishing through the phone records of Stone's and investigating his contacts would not further those legislative interests.

On the other hand, Committee Members have made abundantly clear that their purpose is to investigate the causes of January 6 for law enforcement purposes, not for legislative purposes.  At a minimum, the Congressional Defendants should explain with some specificity how Stone's phone records serves a legislative purpose rather than accepting their *ipse dixit* that the purpose for seeking the phone records is legitimate.

In short, Plaintiffs have stated a plausible claim that the subpoenas for these Plaintiffs' phone records are overly broad and do not further a legitimate legislative purpose.

### III. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE RELEASE OF THEIR PHONE RECORDS VIOLATE THE FOURTH AMENDMENT.

The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects.  It also protects a person's reasonable privacy expectations.  *Katz v. United States*, 389 U.S. 347, 351 (1967).  The fact that a third party at least temporarily stores a person's mobile phone data does not alter her expectation of privacy or its reasonableness.  *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).  As Plaintiffs alleged in Complaint:

> 52. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects.  It also protects a person's reasonable privacy expectations. *Katz v. United*

*States*, 389 U.S. 347, 351 (1967).

53. The fact that a third party at least temporarily stores a person's mobile phone data does  not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

54. The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoena untethered from any valid legislative purpose. See *Oklahoma Press Pub. Co.  v. Walling*, 327 U.S. 186, 196 (1946).

55. If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. None of the Plaintiffs have provided their consent for AT&T to produce their mobile phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoena is invalid.

56. A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

57. The Select Committee's subpoena to both AT&T and Mr. Stone are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee.  *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoenas to AT&T, in particular, contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

58. For the Select Committee to subpoena AT&T for all of Plaintiffs' personal mobile phone data over the course of three months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.  These subpoenas are overbroad on their face and as applied.

59. As the subpoenas in question exceed the lawfully authorized purpose of the Select Committee, full compliance with such subpoena would violate Plaintiffs' Fourth Amendment protection against unlawful search and seizure. The subpoenas are thus invalid and unenforceable.

In their Memorandum in Support of their Motion to Dismiss, the Congressional

Defendants attempt to distinguish *Carpenter* thusly*:*

In *Carpenter,* although historical CSLI [cell-site location information] data was in the possession of a third-party telecommunications company, the Court "decline[d] to extend" *Smith* to historical CSLI, "[g]iven the unique nature of cell phone *location* records" and their ability to "achieve[] near perfect surveillance." *Carpenter*, 138 S. Ct. at 2217-18 (emphasis added).  In particular, the Court

distinguished historical CSLI from the "limited capabilities of a pen register," which consisted of "telephone call logs [that] reveal little in the way of 'identifying information'." *Id.* at 2219 (citation omitted).

Def. Mem. at 29.

At this stage of this litigation, however, Plaintiffs do not know all of the data that is contained in the phone records that the Select Committee is seeking. We do know that, at a minimum, they contain location information noting the city where the call originated and the city of the person on the other end of the call or text message, as well as the duration of the communication, and to that extent, is not unlike the "location records" that were of concern in *Carpenter*. There are numerous other data contained in the phone records, including voice message data that contain additional personal and location information. *See* Subpoena, Exhibit 1 to Complaint. The Court should not dismiss this claim until Plaintiffs have had a chance to engage in discovery to examine the full extent and import of the phone data in AT&T's possession that they intend to turn over to the Select Committee.

In any event, the Court need not reach this constitutional issue if it finds that Plaintiffs have made plausible claim that the release of the phone records violate the statutory provisions regulating the use of such records under the Stored Communications Act and 47 U.S.C. 222(c)(1). If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by consent or otherwise authorized by law. Neither Plaintiffs have provided their consent for AT&T to produce their mobile phone data to the Select Committee. And for the reasons discussed in the following section the Select Committee's subpoena is invalid. The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. §

13

222(c)(1) (similar prohibition).

In sum, Stone and Drake Ventures have made a plausible claim that the subpoenas violate their Fourth Amendment rights.

## IV. PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM UNDER THE STORED COMMUNICATIONS ACT AND 47 U.S.C. § 222(c)(1).

Plaintiffs seek an injunction, "against the Congressional Defendants for issuing an unlawful and overbroad subpoena to Defendant AT&T for Plaintiffs' telephone records and against Defendant AT&T to enjoin them from turning over the phone records to the Congressional Defendants in violation of the Stored Communications Act and the First and Fourth Amendments." Compl., at 4. Regarding the Stored Communications Act, the subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar prohibition [in the Communications Act of 1934, as amended]).   As will be demonstrated, the disclosure of personal phone records of the plaintiffs violates the Stored Communications Act, and/or in the alternative, violates 47 U.S.C. 222(c)(1), which the Congressional Defendants do not address.

At a minimum, Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," the standard for surviving a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs have alleged more than adequate facts, all presumed to be true for purposes of a motion to dismiss, that support their claims that, "The subpoenas violate 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates') and 47 U.S.C. § 222(c)(1) (similar prohibition).

A. **Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," under the Stored Communications Act, 18 U.S.C. § 1039(b).**

In their Complaint, Plaintiffs alleged the following facts, which are presumed to be true for purposes of the Congressional Defendants' Motion to Dismiss Plaintiffs' claim that Congressional Defendants violated 18 U.S.C. § 1039(b)'s prohibition against transferring "confidential phone record information . . . without prior authorization from the customer to whom such confidential phone record information relates":

44.    The AT&T Subpoenas instruct AT&T to produce subscriber information and mobile phone data associated with the phone number(s) used by the Plaintiffs and those on their account. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, session times, and other metadata. The mobile phone data requested includes all calls, text messages, and other records of communications associated with that phone number. This data can be used for historic mobile site analysis.

50.    The requested data arbitrarily covers three full months: November 1, 2020 through January 31, 2021.

51.    Mr. Stone has a reasonable expectation of privacy in his personal mobile phone and data. He remains a private citizen who has never served in government. He has reasonable expectations of privacy and under no required record keeping regulations like government officials or government employees.

52.    The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

53.    The fact that a third party at least temporarily stores a person's mobile phone data does not alter his expectation or its reasonableness. *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

54.    The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoena untethered from any valid legislative purpose. See *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946).

55.    If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must be obtained by

consent or otherwise authorized by law. None of the Plaintiffs have provided their consent for AT&T to produce their mobile phone data to the Select Committee. And for the reasons discussed *infra*, the Select Committee's subpoena is invalid.

56.    A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power.  See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

57.    The Select Committee's subpoena to both AT&T and Mr. Stone are so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960). The subpoenas to AT&T, in particular, contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

58.    For the Select Committee to subpoena AT&T for all of Plaintiffs' personal mobile phone data over the course of three months is entirely unreasonable. Such a request is so broad both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.  These subpoenas are overbroad on their face and as applied.

Based on the above alleged facts, which are presumed to be true for purposes of the Motion to Dismiss, Plaintiffs' articulate a claim that the subpoena violates 18 U.S.C. § 1039(b) (making it a crime to transfer 'confidential phone records information . . . without prior authorization from the customer to whom such confidential phone records information relates'), the Court should deny Congressional Defendants' Motion to Dismiss.

Section 1039(b) of Title 18, which is title, "PROHIBITION ON SALE OR TRANSFER OF CONFIDENTIAL PHONE RECORDS INFORMATION," provides:

(1) Except as otherwise permitted by applicable law, whoever, in interstate or foreign commerce, knowingly and intentionally sells or transfers, or attempts to sell or transfer, confidential phone records information of a covered entity, without prior authorization from the customer to whom such confidential phone records information relates, or knowing or having reason to know such information was obtained fraudulently, shall be fined under this title, imprisoned not more than 10 years, or both.

(2) For purposes of this subsection, the exceptions specified in section 222(d) of the Communications Act of 1934 shall apply for the use of confidential phone records information by any covered entity, as defined in subsection (h).

Subsection (h)(1), in turn, defines "confidential phone records information" as "information that":

> (A) relates to the quantity, technical configuration, type, destination, location, or amount of use of a service offered by a covered entity, subscribed to by any customer of that covered entity, and kept by or on behalf of that covered entity solely by virtue of the relationship between that covered entity and the customer;

> (B) is made available to a covered entity by a customer solely by virtue of the relationship between that covered entity and the customer; or

> (C) is contained in any bill, itemization, or account statement provided to a customer by or on behalf of a covered entity solely by virtue of the relationship between that covered entity and the customer.

Instead of attempting to satisfy their burden of persuasion, defendants argue to the Court that the Complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," Congressional Defendants posit that, "The Stored Communications Act contains no restrictions on Congress obtaining non-content records through a Congressional subpoena." Def. Mem. at 22. The fundamental constitutional flaw of this reasoning is that if there is no express prohibition against Congress for exercising power, then Congress has all unenumerated powers that are not prohibited -- the opposite of what the Tenth Amendment confirms. *Cf. NFIB v. Sebelius*, 567 U.S. 519, 535 (2012) ("If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.").

Congressional Defendants then argue that, "The Act generally allows disclosure of non-content records," citing no authorization in the Act, "although it prohibits (with one exception) voluntary disclosure on non-content records to 'governmental entit[ies].' 18 U.S.C. § 2702(a)(3), (c)(4). The definition of the term 'government entity,' as used in

the Act, does not include Congress. *Id.* §§ 6, 2711(4). And the Act expressly permits disclosure to "any person other than a governmental entity.' *Id.* § 2702(c)(6)." Def. Mem. at 22.

The common-sense definition of "government entity" does include the Congress and its committees, yet the Congressional Defendants argue they are not bound by the prohibition against non-authorized-by-the-customer release of customer records because each of the Congressional Defendants is a "person other than a government entity" exempt from the prohibition by 18 U.S.C. 2702(b)(6). Def. Mem. at 24.

Congressional Defendants cite the U.S. Supreme Court's distinguishable decision in *Hubbard v. United States*, 514 U.S. 695 (1995), in support of their argument that the Stored Communications Act's "definition of 'government entity' and the definition contained in Section 6 [of Title 18] make plain that the term 'government entity' does not apply to Congress. There is nothing in the Act that even suggests, let alone 'shows,' that Congress intended to include itself in the definition." Def. Mem. at 23-24.

In the first place, it is not "plain" that the definition of "government entity" does not apply to Congress. As one commentator put it:

> My point here is not that Congress's ability to obtain content information is clear; rather, my point is that the prohibition *against* the use of congressional process is ambiguous. Textual uncertainty exists because Congress treats itself differently than other government entities, often imposing limits on others' investigative activities that it does not apply to itself, arguably including the prohibitions in § 2702.

Aaron R. Cooper, *Congressional Surveillance*, 70 Am. U. L. Rev. 1799, 1833 (2021).

Fortunately, the Supreme Court provided this guidance for ascertaining whether the Congressional Defendants have the power they claim, regardless of whether Congress

has expressed an intent "to include itself in the definition" that would forbid the Congressional Defendants from exercising the power at issue: "The question is not what power the Federal Government ought to have but what powers in fact have been given by the people." *New York v. United States*, 505 U.S at 157 (internal citation omitted); *cf. United States v. Heth*, 7 U.S. (3 Cranch) 399, 409 (1806) ("If it be necessary that the Court should make an election between these words in order to complete the sense [of a statute], its choice will be immediately determined by recurring to two well-known rules of construction, *viz.,* that it ought to be consistent with the suggestions of natural justice and that the words should be taken most strongly *'contra proferentem'.");  Mesa Air Group, Inc. v. Department of Transp*., 87 F.3d 498, 506 (D.C. Cir. 1996) *("Contra proferentum* is a basic principle of contract law which provides that '[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.'  Restatement (Second) of Contracts, § 206 (1979)")*.  Accordingly, any ambiguity about whether the Congress has exempt itself from the definition of "government entity" should be construed against Congress and in favor of the individual whose confidential phone records are being subpoenaed.

Congressional Defendants acknowledge that *Hubbard v. United States*, 514 U.S. 695 (1995), which involved "the applicability of 18 U.S.C. § 1001, forbidding making false statements to 'any department or agency of the United States,' to the Judicial Branch," Def. Mem. at 23, was effectively overruled by a subsequent Act of Congress: "After the ruling in Hubbard, Congress amended the statute at issue, 18 U.S.C. § 1001. *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292 §2."  Def. Mem.

at 23, fn. 29.  Congress amended 18 U.S.C. § 1001 in the aftermath of *Hubbard v. United States*  to make it a crime for anyone "within the jurisdiction of the executive, legislative, or judicial branch of the Government" to do any of the following fraudulent acts "knowingly and willfully":

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

18 U.S.C. § 1001(a).  Subsection 1001(b) provides exceptions for certain Judicial Branch activities, and Subsection 1001(c), instead of making exceptions, provides that, "within the jurisdiction of the legislative branch, subsection (a) shall only apply to – (1) administrative matters, . . . ; or (b) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate."

In short, where there is exposure to criminal liability for making a false statement to a government agency, the Courts require Congress to speak clearly that the legislative branch is covered by the proscription.  Similarly, when Congress purports to exempt itself from the definition of "government entity" in the Stored Communications Act, it should also make it clear that it is **not** a "government entity" despite the common sense meaning of that term that it is. The Stored Communications Act has been on the books since 1986.  If Congress wished to include itself in the Act's "governmental entity" exceptions to the general prohibition against disclosing information, it certainly could have done so as it did in the context of 18 U.S.C. §1001.

**B. Plaintiffs have alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'," under the Communications Act of 1934, as amended, 47 U.S.C. § 222(c)(1).**

Section 222(c)(1) of the Communications Act of 1934, as amended, provides: "PRIVACY REQUIREMENTS FOR TELECOMMUNICATIONS CARRIERS[:] Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." 47 U.S.C. § 222(c)(1).

In addition to the arguments in opposition to dismissal presented in the previous section, Plaintiffs would point out that the prohibition in 47 U.S.C. § 222(c)(1) against "disclos[ing] or permit[ting] access to individually identifiable customer proprietary network information" without "authorization from the customer" is an independent statutory prohibition that the Congressional Defendants have not even briefed in their Memorandum in Support of Their Motion to Dismiss.

Accordingly, even if the Court were to accept the Congressional Defendants' argument that it should dismiss Plaintiffs' claim that Congressional Defendants have violated 18 U.S.C. § 1039(b), the Congressional Defendants did not even attempt to satisfy their burden to persuade the Court that the Plaintiffs' claim that Congressional Defendants have violated 47 U.S.C. § 222(c)(1)'s prohibition should be dismissed.  Accordingly, Plaintiffs' claim that Congressional

Defendants have violated 47 U.S.C. § 222(c)(1) cannot be dismissed.

## V.  PLAINTIFFS HAVE STATED A PLAUSIBLE CLAIM THAT THE SUBPOENAS FOR THEIR PHONE RECORDS VIOLATE THE FIRST AMENDMENT.

By seeking information about Plaintiffs' personal and professional communications, the Select Committee is improperly attempting to obtain information about Plaintiffs' free speech and association activities that are protected by the First Amendment.   The Select Committee cannot demonstrate a compelling justification that would justify this intrusion. *See e.g., NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963).

In his Complaint, Stone alleged the First Amendment harms he suffered from the subpoena for his phone records:

65. Some colleagues, business prospects, former clients, and associates have not spoken to Mr. Stone or ceased communication with him because of public reports that his phone records would be obtained. This has harmed his ability to effectively exercise his First Amendment rights and conduct his business.

66. Mr. Stone used his personal mobile device to engage in protected advocacy and other speech, including privileged speech with his attorney(s) and clergy.

67.  All of these associational and expressive activities are protected by the First Amendment.  *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d  1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003); *NAACP v. Alabama*, 357 U.S. 440 (1958).

68. The information sought from AT&T by the Select Committee would also intrude on Plaintiffs; rights to freedom of association as protected by the First Amendment of the U.S. Constitution. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).  Volunteers, would be discouraged from participating in future efforts with Mr. Stone if their phone records (including those on their family plan) can be subpoenaed so arbitrarily and their private phone contacts exposed to government scrutiny and harassment.

Stone's cellular telephone and text message "call-data" records are the modern-day equivalent of a membership list in that, in addition to disclosing information about personal

22

communications, it may provide records of calls and messaging that are not pertinent to the Committee's investigation, and thus overbroad in its scope.   plan is highly intrusive, chills her association rights, as well as being beyond the scope of the Committee's legislative interest. Assumptions are made publicly about simple legal phone calls turn into supposition of criminal behavior.

In that regard, the Danelle Brian, the Chair of the Project on Government Oversight (POGO), submitted a letter to Committee Chairman Thompson on October 5, 2021, expressing grave concerns about the subpoenas' impact on First Amendment freedoms, stating in part:

> Indeed, we at POGO were the subject of overreaching subpoena in the 1990s, including subpoena for my home phone records, in an effort to identify whistleblowers who had exposed the oil and gas industry's fraud in underpaying royalties.
>
> If similar efforts to target and malign government critics or marginalized communities are attempted in the future, it is vital they cannot weaponize the vast array of private digital information that exists in modern society, or collect such information to harm or chill expression by religious minorities, political dissidents, or whistleblowers. The actions the committee takes in the coming weeks may set important precedent for how congressional demands for records are used going forward. (footnote omitted).[1]

Even where pertinent records are sought, before a legislative committee proceeds "in such a manner will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights" it must lay an "adequate foundation for inquiry" and demonstrate a "compelling and subordinating governmental interest."  *Gibson v. Florida Investigation Committee,* 372 U.S. 539, 540 (1963).  For example, what possible information could the Committee obtain from Plaintiff Torre's phone records at this stage of its investigation that would serve its legislative interest?

---

[1] https://www.pogo.org/letter/2021/10/letter-to-january-6-committee-supporting-careful-use-of-subpoena-authority/.

In sum, Plaintiffs have sufficiently alleged facts that the phone records sought are not pertinent or that the Select Committing has not demonstrated a "compelling and subordinating government interest," and their production would violate their First Amendment rights. Accordingly, this Count should not be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should deny Congressional Defendants' Motion to Dismiss Plaintiffs' Complaint because Plaintiffs have alleged facts that plausibly state a claim upon which relief can be granted under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Dated: August 12, 2022

/s/ Robert Buschel
Robert C. Buschel (DDC Bar No. FL-0039)
  *Counsel of Record*
BUSCHEL GIBBONS, P.A.
501 E. Las Olas Blvd., Suite 304
Fort Lauderdale, FL 33301
(954) 530-5301
buschel@bglaw-pa.com


*/s/Grant J. Smith*
(DDC Bar No. FL-36)
StrategySmith, P.A.
401 East Las Olas Boulevard
Suite 130-120
Fort Lauderdale, FL 33301
(954) 328-9064
gsmith@strategysmith.com


*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2022, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send a notice of electronic filing to all registered parties.


/s/ Robert Buschel
_____
Robert C. Buschel
*Counsel for Roger Stone & Drake Ventures, LLC.*